# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Alfred J. Edwards, *et al.*,

      Plaintiffs,

                                          **Case No. C2-06-0789**

    v.                                       **JUDGE SMITH**

                                               **Magistrate Judge Kemp**

City of Martins Ferry, *et al.*,

      Defendants.

## OPINION AND ORDER

Plaintiffs Alfred J. Edwards and Mary Eva Edwards assert federal claims under 42 U.S.C. § 1983 for violations of their Fourth and Fourteenth Amendment rights. Specifically, Plaintiffs assert claims of excessive force, deliberate indifference to a serious medical need, failure to properly train and supervise, and loss of consortium. Defendants now move for summary judgment on all Plaintiffs' claims against them (Doc. 34). Plaintiffs filed their response (Doc. 40) and the motion is now ripe for review. For the following reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment. There is also a Motion to Compel pending before the Court filed by Plaintiff on December 4, 2007 (Doc. 47). The Magistrate Judge held a status conference on the discovery issues on December 11, 2007, and the issues were resolved and no further briefing was required. Therefore, the Motion to Compel is now moot.

# I.    FACTS

Plaintiffs Alfred J. Edwards and Mary Eva Edwards are residents of Martins Ferry, Ohio. Defendant Chad Dojack is a police officer who is currently employed by Defendant City of Martins Ferry and/or Defendant City of Martins Ferry Police Department.  He is being sued in his individual and official capacities.

On the morning of June 11, 2005, Plaintiff Alfred Edwards walked from his house to a nearby park, a normal practice of his.  Mr. Edwards was eighty-two years old and suffering from Alzheimer's Disease.  While at the park, Mr. Edwards had the need to urinate, but there were no public restrooms in the park.  Mr. Edwards then looked around, and after determining he was alone, went behind a bush to relieve himself.  Mr. Edwards then continued his walk. (Compl. ¶¶ 8-14).

While walking down North Zane Highway, Mr. Edwards was confronted by Martins Ferry Police Officer Chad Dojack.  Officer Dojack was responding to several calls from individuals complaining about a male subject that was urinating at the city park in the presence of juveniles.  A physical description was given.  Officer Dojack first arrived at the park and several individuals pointed north on the Zane Highway to indicate the direction of travel of the male suspect.  Officer Dojack then traveled north on the Zane Highway and pulled up on the sidewalk in front of "The Shop," a local business operated by Richard Thomas.  Officer Dojack was in uniform, identified himself to Mr. Edwards, and said "come here."  (Defs.' Mot. for Summ. J. at 1).

Mr. Thomas was working in his automobile repair shop when this incident occurred.  He was approximately 35 feet away from where the encounter between Officer Dojack and Mr.

Edwards took place.  (Thomas Depo. at 6).[1]  According to Mr. Thomas, Officer Dojack pulled up in his police car, got out, and yelled at Mr. Edwards to stop.  It is further alleged that Officer Dojack demanded that Plaintiff provide identification.  (Compl. ¶ 17).  Mr. Edwards responded that he did not have his wallet with him and that he was on the way home.  (Compl. ¶ 18).  Mr. Edwards then attempted to walk away and Officer Dojack grabbed him.  (Compl. ¶¶ 19-20). During this time, Mr. Edwards kept repeating that he wanted to go home, that it was getting hot out.  (Compl. ¶ 21; Thomas Depo. at 6-9).

Mr. Thomas further describes that Officer Dojack told Mr. Edwards to "come here" and then reached over and grabbed Mr. Edwards by the arm.  (Thomas Depo. at 6).  Mr. Edwards then jerked away and put his hands up in the air like a football goal post.[2]  (Thomas Depo. at 6, 21, 23-24).  Then, Officer Dojack backed away and pulled his taser gun out.  (Thomas Depo. at 24).  Officer Dojack instructed Mr. Edwards not to move.  Then he grabbed Mr. Edwards and slammed him against the hood of the police cruiser.  (Compl. ¶ 23; Thomas Depo. at 26).[3]  While on the police cruiser, Mr. Edwards again tried to pull away.[4]  Officer Dojack stated that he

---

[1] Plaintiffs' description of the events are based primarily on the deposition testimony of Mr. Thomas, who as Defendants point out, was friendly with Plaintiffs' family.  Additionally, the Plaintiffs' sons were deposed, however, they were not present during the incident and do not have first hand knowledge of the events in question.  The Court has been informed that Plaintiff Mr. Edwards was not deposed in this case because of the progression of his dementia.

[2] Officer Dojack stated that he thought Mr. Edwards assumed the boxing stance and was squaring off with him.  (Dojack Depo. at 15).

[3] The Complaint states that "Officer Dojack forced Alfred J. Edwards' hands behind his back and pushed his nightstick into Alfred J. Edwards' back."  (Compl. ¶ 22).  However, Mr. Thomas testified that Officer Dojack did not possess nor use a nightstick on Mr. Edwards. (Thomas Depo. at 23).

[4] Mr. Thomas stated in his police statement immediately after the incident that after Officer Dojack had Mr. Edwards on the hood of the car, Mr. Edwards tried to pull away.  But

3

advised Mr. Edwards that he was under arrest, to put his hands behind his back, but he failed to

comply.  (Dojack Depo. at 16).  Then, while Officer Dojack was restraining Mr. Edwards on the

hood of the patrol car, he deployed the taser on Mr. Edwards for "maybe a second."[5]  (Dojack

Depo. at 22).  Mr. Thomas then described that Officer Dojack told Mr. Edwards "the next

fucking time I tell you to come here, you'll come here."  (Thomas Depo. at 7).[6]

After the taser was deployed, Officer Dojack was able to handcuff Mr. Edwards and put

him in the police cruiser.  Mr. Edwards was then taken to the Martins Ferry Police Station.

(Compl. ¶¶ 25-26).

Officer Tom Siburt, also with the Martins Ferry Police Department, was a block and a

half down the street at a gas station and observed the incident.  Officer Siburt observed Officer

Dojack approach the male subject and saw him start to walk away.  Officer Siburt then saw

Officer Dojack try to stop the man and saw the man pull away.  (Siburt Depo. at 14).  Officer

Siburt then describes seeing the man "more or less square off with Officer Dojack."  (Siburt

Depo. at 16).  Officer Siburt got in his cruiser to go and assist Officer Dojack.  As he was pulling

up, he saw Officer Dojack wrestling with Mr. Edwards.  Officer Siburt described that he

intended to help Officer Dojack "control the person."  (Siburt Depo. at 15).  Officer Siburt

---

then during his deposition, nearly 2 years later, he said Mr. Edwards did not try to pull away
once on the car.  (Edwards Depo. at 26-27).

[5] Notably, the Complaint states that "Officer Dojack fired his taser at Alfred J. Edwards
three times."  (Compl. ¶ 24).  Mr. Thomas stated that he could not see the taser being deployed
but believes he heard it deployed twice.  (Thomas Depo. at 27-28).  Officer Dojack stated that he
deployed the taser for a second.  (Dojack Depo. at 22).

[6] Officer Dojack denies making any such comment to Mr. Edwards and Officer Siburt
who was present at the scene when this comment was allegedly made, denies hearing any such
comment.  (Dojack Depo. at 22; Siburt Depo. at 17).

further stated that he observed "a lot of thrashing around and flailing as Officer Dojack was trying to get him [plaintiff] under control." (Siburt Depo. at 16). Officer Siburt stated that Officer Dojack deployed his taser once.[7] Mr. Edwards was offered but refused medical attention. (Dojack Depo. at 16). At no time during this incident did Office Dojack or Officer Siburt believe Mr. Edwards was suffering from some kind of mental problem. (Dojack Depo. at 16).

Officer Siburt later realized he vaguely recognized Mr. Edwards and after calmly conversing with him, determined there was something wrong with him. (Siburt Depo. at 18-19). Officer Siburt then stated that "the concern at that point was just trying to get family there, get some family member there to help deal with Mr. Edwards and get him home as opposed to going to jail." (Siburt Depo. at 22).

After the incident, Plaintiff's sons, Dave Edwards and James Edwards, came to the police department and complained about the deployment of the taser on their father, who they described was suffering from Alzheimer's. However, neither David Edwards nor James Edwards witnessed the incident. (Edwards Depo. at 17). The Martins Ferry Police Chief Carpenter turned the investigation of Officer Dojack's conduct over to the Department of Justice because the Martins Ferry Police Department did not have an Internal Affairs Division. The Department of Justice found no wrongdoing on Officer Dojack's part. (Carpenter Depo. at 39, 46).

Plaintiffs initiated this case on September 18, 2006, asserting that Defendant Officer

---

[7] Officer Dojack stated that he removed the probe cartridge from his taser before applying it to Plaintiff. (Dojack Depo. at 22).

Dojack used excessive force during the arrest of Mr. Edwards in violation of the Fourth and

Fourteenth Amendments to the United States Constitution.  Plaintiffs also assert claims of

deliberate indifference to a serious medical need, failure to properly train and supervise, and loss

of consortium.

## II.    SUMMARY JUDGMENT

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which

provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions,
> answers to interrogatories, and admissions on file, together with the affidavits, if
> any, show that there is no genuine issue as to any material fact and that the
> moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate,

however, if the opposing party fails to make a showing sufficient to establish the existence of an

element essential to that party's case and on which that party will bear the burden of proof at

trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial

Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable

inferences in favor of the nonmoving party, and must refrain from making credibility

determinations or weighing the evidence.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

133, 150-51 (2000).[8]   The Court disregards all evidence favorable to the moving party that the jury would not be required to believe.  *Id.*  Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses.  *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby*, *Celotex*, and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989).  The court in *Street* identified a number of important principles applicable in new era summary judgment practice.  For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment.  *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'"  *Id.* (*quoting Liberty Lobby*, 477 U.S. at 257).  The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion.  *Id.*  It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as

---

[8]  *Reeves* involved a motion judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial summary judgment under Fed. R. Civ. P. 56. Nonetheless, standards applied to both kinds of motions are substantially the same.  One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the Court, having already heard the evidence admitted in the trial, views the entire record, *Reeves*, 530 U.S. at 150.  In contrast, in ruling on a summary motion, the Court will not have heard all of the evidence, and accordingly the non-moving party has the duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact, and the court need not comb the paper record for the benefit of the nonmoving party.  *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). As such, *Reeves* did not announce a new standard of review for summary judgment motions.

to the material facts.'" *Id.* (*quoting Matsushita*, 475 U.S. at 586).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

## III. DISCUSSION

Defendants, the City of Martins Ferry, the City of Martins Ferry Police Department, and Officer Chad Dojack move for summary judgment on all of Plaintiff's claims. Defendants argue that they did not violate any of Plaintiffs' constitutional rights and are therefore entitled to qualified immunity.

### A. Qualified Immunity

Defendant Dojack asserts that he is entitled to qualified immunity from Plaintiffs' claims against him because he did not violate any of Plaintiffs' constitutionally protected rights and is therefore entitled to summary judgment on the issue of qualified immunity. Plaintiffs, however, argue that the defense of qualified immunity does not protect Officer Dojack from liability because a jury could find that his actions were unreasonable.

Under the doctrine of qualified immunity, government officials performing discretionary functions are immune from suit unless the plaintiff shows the official violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Conn v. Gabbert*, 525 U.S. 286, 290 (1999) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The central purpose of affording public officials qualified immunity from suit is to

protect them 'from undue interference with their duties and from potentially disabling threats of liability.'"  *Elder v. Holloway*, 510 U.S. 510, 514 (1994) (*quoting Harlow*, 457 U.S. at 806)). Qualified immunity operates "to protect officers from the sometimes hazy border between excessive and acceptable force." *Saucier v. Katz*, 533 U.S. 194, 206 (2001).  The burden is on the plaintiff to show that the defendant is not entitled to qualified immunity. *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006).

The Court must apply a two-step test to determine whether qualified immunity protects a government official.  *Conn*, 526 U.S. at 290; *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1358 (6th Cir. 1996).  The first step is to determine whether a violation of a clearly established constitutional right has occurred.  *Conn*, 526 U.S. at 290; *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996).  If a constitutional violation is found, the second step is to determine whether an objectively reasonable public official in the circumstances would have recognized that his conduct violated the clearly established constitutional right.  *Conn*, 526 U.S. at 290; *Buchanan*, 99 F.3d at 1358; *Dickerson*, 101 F.3d at 1158.

To be clearly established at the time of the conduct in question, the constitutional right must have been recognized by the U.S. Supreme Court, the United States Court of Appeals for the Sixth Circuit, this Court or other courts within the Sixth Circuit, or, in some cases, courts of other circuits.  *Sheets v. Moore*, 97 F.3d 164, 166 (6th Cir. 1996); *Dickerson*, 101 F.3d at 1158. "The contours of the right must be sufficiently clear that a reasonable person would understand that what he is doing violates that right."  *Sheets*, 97 F.3d at 166.  "This is not to say that an official action is protected by qualified immunity unless the very action has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent."  *Id.*

(*quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

### 1. Constitutional Violation

Plaintiffs argue that Defendant Officer Dojack violated the constitutional rights of Mr. Edwards by using excessive force during his arrest. The Court will therefore determine whether Officer Dojack violated Mr. Edwards' constitutional rights in accordance with the first prong of the qualified immunity test.

### a. Excessive Force

Excessive force claims are "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989); *see also Phelps v. Coy*, 286 F.2d 295, 299 (6th Cir. 2002). The Fourth Amendment requires that an officer's use of force be objectively reasonable, and courts must balance the consequences to the individual against the government's interests in effecting the seizure. *See Graham*, 490 U.S. at 396. It is the Court's duty, therefore, to determine whether the officer's actions were objectively reasonable. *See Scott v. Harris*, 127 S.Ct. 1769, 1776 (2007) (expressly rejecting Justice Stevens' assertion in his dissent that the question of objective reasonableness is "a question of fact best reserved for the jury." *Id*. at 1776 n.8). As the *Scott* Court explained, "at the summary judgment stage . . . once we have determined the relevant set of facts and drawn all inferences in favor of the non-moving party *to the extent supportable by the record*, . . . the reasonableness of [the officer's] actions . . . is a pure question of law." *Id*. at 1776, n.8.

This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case. *Graham,* 490 U.S. at 396; *see also Marvin v. City of Taylor*, 509 F.3d 234, 245 (6th Cir. 2007).

"[R]easonableness must be evaluated from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight." *Id.* Courts evaluating the reasonableness of force used "should pay particular attention to 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Darrah v. City of Oak Park*, 255 F.3d 301, 307 (6th Cir. 2001) (*quoting Graham*, 490 U.S. at 396); *see also Marvin*, 509 F.3d at 245. "The definition of reasonable force is partially dependent on the demeanor of the suspect." *Solomon v. Auburn Hills Police Dept.*, 389 F.3d 167, 172 (6th Cir. 2004). Culpability is also relevant to the reasonableness analysis. *Scott*, 127 S.Ct. at 1778, n.10.

In the instant case, Plaintiffs claim that the force used in effecting Mr. Edwards' arrest was unreasonable. Specifically, Plaintiffs assert that Officer Dojack's use of the taser on Mr. Edwards, who was 82 years old and suffering from Alzheimer's, was unconstitutionally excessive. (*See* Pls.' Memo. in Opp. at 4). The Court disagrees.

Plaintiffs' reasonableness analysis referenced that Mr. Edwards "might have been guilty of urinating in public." (Pls.' Memo. in Opp. at 5). Plaintiffs, however, admit this in the Complaint. (Compl. ¶¶ 10-13). Plaintiffs concede that Officer Dojack had probable cause to stop Mr. Edwards and probable cause to arrest him, therefore, the only question is whether the use of the taser constitutes excessive force.

Plaintiffs argue that Mr. Edwards never threatened, attempted to hit or verbally abused Officer Dojack. But absent from this description is that Mr. Edwards refused to comply with Officer Dojack's initial orders. (Thomas Depo. at 20-21). Mr. Thomas admitted that he could "pretty much" see and hear what was going on between Officer Dojack and Mr. Edwards.

11

(Thomas Depo. at 20). The record before the Court is unusual to say the least because the primary Plaintiff was not even deposed as a result of his Alzheimer's. Construing the facts in favor of the Plaintiff is difficult because there are inconsistencies between Plaintiffs' Complaint and their Memorandum in Opposition to Defendants' Motion to Dismiss. Further inconsistencies arise in the deposition testimony of Mr. Thomas, who observed the incident, but could not hear or see everything that took place. Finally, Officers Dojack and Siburt present another set of facts.[9]

There are more inconsistencies when you consider Mr. Thomas described that Officer Dojack slammed Mr. Edwards on the police cruiser and he thought he heard the taser twice. However, Mr. Edwards did not suffer any injuries. Further, there is no evidence that Mr. Edwards stated to either officer that he was injured and needed medical attention, yet Plaintiffs assert a claim for deliberate indifference to a serious medical need.

Plaintiffs primary argument for why Officer Dojack's use of the taser was unreasonable is because Mr. Edwards was 82 years old and suffering from Alzheimer's. However, there is no caselaw provided in support of this argument that Mr. Edwards' age precludes use of the taser. Officer Dojack, at first, was merely trying to talk to Mr. Edwards, but soon realized that was not possible. Then, Officer Dojack attempted to grab him, but Mr. Edwards continued to pull away. Officer Dojack then attempted to restrain Mr. Edwards. Regardless of Mr. Edwards' age and the fact that he had Alzheimer's, he was not cooperating with Officer Dojack, and his actions could

_____

[9]In circumstances such as these, the *Scott* Court instructed: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 127 S.Ct. at 1776.

be construed as resisting arrest.

Officer Dojack received use of force training and was instructed to follow a use of force continuum. (Carpenter Depo. at 15). The use of force continuum has five levels of force from verbal commands to deadly force. Force escalation is applied based on the suspect's response to officer conduct. Typically, force would escalate from officer presence or verbal commands to the officer placing his hands on an individual to the deployment of an electrical or less than lethal device. The taser would fall under the third level of force on the continuum. (Carpenter Depo. at 17).

The law does not permit an officer to simply ignore citizen complaints about the commission of a crime. Officer Dojack could not permit Mr. Edwards to simply walk away because of his age, as Plaintiffs would have liked. Defendants rely on several cases in support of their argument that Officer Dojack's use of the taser to subdue Mr. Edwards was reasonable. *See Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (officer's use of the taser gun to effectuate the arrest of the plaintiff was reasonably proportionate to the difficult, tense, and uncertain situation that the officer faced in the traffic stop and did not constitute excessive force); *Hinton v. Elwood*, 997 F.2d 774 (10th Cir. 1993) (use of force reasonable when plaintiff refused to talk to the police when they requested he stop, shoved the police when they tried to calm him down, and suffered deployment of the taser after considerable level of resistance); *Gaddis v. Redford Township,* 364 F.3d 763 (6th Cir. 2004) (suspect's repeated refusal to comply with the officer's requests and expressed intent to continue evading arrest qualified as resisting arrest and justified the application of non-lethal force); *Francis v. Pike County*, 708 F. Supp. 170 (S.D. Ohio 1988), aff'd 875 F.2d 863 (6th Cir. 1989) (use of stun gun to restrain an individual

13

who resisted being handcuffed did not constitute excessive force).

In each of the aformentioned cases, the suspect was stopped for a misdemeanor offense and then refused to comply with the officer's orders. Each incident escalated to the officer's need to use non-lethal force, such as the taser, and in each case it was found to be justified in the situation. Plaintiffs argue that these case are not like the case at bar because Mr. Edwards did not have a weapon and was not resisting arrest. Plaintiffs do assert that even if the Court were to find there was some resistance by Mr. Edwards, it is improper for the Court to decide whether that justified Officer Dojack's actions. (Pls.' Memo. in Opp. at 7). The Court, however, finds that it is proper to decide whether Officer Dojack's actions were reasonable at this stage. *See Scott, supra*, 127 S.Ct. at 1776.

Plaintiffs rely on *Ciminillo v. Streicher*, 434 F.3d 461 (6th Cir. 2006), in support of their argument that Officer Dojack's conduct was unreasonable. In *Ciminillo*, the Sixth Circuit reversed the District Court, finding that the officer was not entitled to qualified immunity because it was objectively unreasonable for the officer to use less-than-deadly force in the context of a riot against an individual who posed no risk, was engaged in no crime, and was not attempting to evade the police. *Id.* at 468-469. This case, however, is distinguishable from *Ciminillo*. There was no evidence that the plaintiff in *Ciminillo* had committed any crime and was attempting to resist arrest. Further, the plaintiff in *Ciminillo* was shot in the face with a beanbag shot gun and needed stitches and a collapsed lung. Plaintiff in the case at bar was stopped for a potential misdemeanor violation, public urination. He was not just an innocent bystander as Plaintiffs would like the Court to believe. Finally, Plaintiff did not suffer any injuries.

14

While the severity of the crime is not a factor in this case, it was reasonable for Officer Dojack to believe that Mr. Edwards could pose a threat in that he was resisting arrest. While Mr. Edwards was initially stopped for a misdemeanor, the situation changed when he refused to answer Officer Dojack's initial questions. Mr. Edwards' continued failure to respond and to comply with Officer Dojack's instructions then justified an escalation of the use of force. Officer Dojack attempted to grab Mr. Edwards. Mr. Edwards then backed away and put his hands up in what has been described as football goal posts. Officer Dojack, however, interpreted this as Mr. Edwards squaring off with him. This then justified another escalation in the use of force to the taser. Once Officer Dojack began to restrain Mr. Edwards, he had to continue, and it seems the only way he was able to do this was with the taser. Therefore, the Court finds that Mr. Edwards was not subjected to excessive force during his arrest.

Plaintiffs further argue that Officer Dojack should have known that Mr. Edwards was suffering from a mental illness and thus should not have tasered him. However, there is no evidence that Officer Dojack was aware of this. Further, there is no caselaw to support any such heightened standard for suspects who suffer from some mental impairment.

After considering Plaintiffs' argument in light of the aforementioned cases, the Court finds that Officer Dojack's stop and subsequent arrest of Mr. Edwards was reasonable given the circumstances. Officer Dojack progressed up the level of force continuum until he was able to handcuff Mr. Edwards. Therefore, Plaintiffs have failed to establish the deprivation of his Fourth Amendment Rights.

## 2.        Clearly Established

If the Court were to have found that the Defendants violated any of Plaintiffs'

constitutional rights, then the next step would be to ask whether the right was "clearly

established" in a particularized sense, such that "it would be clear to a reasonable officer that his

conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

"The contours of the right must be sufficiently clear that a reasonable official would understand

that what he is doing violates that right." *Myers v. Potter*, 422 F.3d 347, 356 (6th Cir. 2005)

(*quoting Anderson v. Creighton*, 483 U.S. 635 (1987)). "This is not to say that an official action

is protected by qualified immunity unless the very action in question has previously been held

unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

*Anderson*, 483 U.S. at 640.

Thus, we must determine whether it would have been clear to a reasonable officer in

Officer Dojack's position that using the taser on Mr. Edwards was unreasonable.  It was clearly

established law in this Circuit at the time of the underlying events that individuals have a right to

be free from excessive force unless they are perceived as posing a threat to officers or others.

*Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991); *Robinson v. Bibb*, 840 F.2d 349,

351 (6th Cir. 1988).  The Sixth Circuit has previously held that the use of less-than-deadly force,

including pepper spray, may be excessive.  In *Adams v. Metiva*, 31 F.3d 375, 385-86 (6th Cir.

1994), this Court held that summary judgment was inappropriate for an excessive-force claim

brought against police officers who allegedly sprayed the plaintiff with pepper spray, when it

remained disputed whether the plaintiff had committed a crime, whether he posed a threat, and

whether he was resisting arrest.  Thus, based on the aforementioned caselaw in this Circuit, it

16

was clearly established that individuals have a general right to be free from the unreasonable use of non-lethal force.  However, as previously determined, Officer Dojack's use of the taser on Mr. Edwards was not unreasonable under the circumstances, and therefore his actions did not constitute excessive force.

### 3.       Objectively Reasonable Officer test

Even if the Court were to have found that Defendants did violate Plaintiffs' clearly established constitutional rights, Plaintiffs cannot establish that an objectively reasonable officer faced with the same circumstances as Officer Dojack would have recognized that the conduct violated a clearly established constitutional right.  The final test for qualified immunity is whether an objectively reasonable officer under the circumstances would have known that the officer's conduct violated the constitution in light of the preexisting law.

Considering the circumstances in this case, that Mr. Edwards refused to answer Officer Dojack's simple questions and refused to comply with his initial orders, and then backed away and drew his hands up, a reasonable officer would attempt to secure the arrest of the suspect. Then, when the suspect continued to resist arrest while the officer was trying to place handcuffs on him, a reasonable officer would take the use of force to the next level on the continuum to the taser.  Therefore, such use of force under these circumstances was not a violation of Mr. Edward's constitutional rights.  Accordingly, Defendant Officer Dojack is entitled to qualified immunity.

### B.       Failure to Properly Train and Supervise Claims

Plaintiffs allege that the City of Martins Ferry and the Martins Ferry Police Department

17

have a

> policy and/or custom of failing to properly train and supervise its police officers
> with respect to:
>
> a.        The use of force;
>
> b.        The use of weapons, including but not limited to nightsticks and tazers
> and
>
> c.        Recognizing and interacting with individuals who are suffering from
> mental conditions such as Alzheimer's Disease and
>
> d.        Providing proper medical treatment and care to those in their custody.

(Compl. ¶ 38). The City of Martins Ferry and the Martins Ferry Police Department, in their official capacities, have moved for summary judgment on the Plaintiffs' § 1983 failure to train and supervise claims.

In *Monell v. Department of Social Svcs.*, 436 U.S. 658 (1978), the Supreme Court established that municipalities and other local governments are persons within the meaning of § 1983, and therefore may face liability under § 1983. *Monell*, however, limits municipal liability to situations where the deprivation of constitutional rights results from an official policy or custom of the municipality. *Id.* at 690. In addition, *Monell* prevents a municipality from being held liable under a respondeat superior theory. *Id.* at 691.

In *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989), the Supreme Court articulated the standard for failure to train claims. The inadequacy of police training may serve as the basis for § 1983 liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 387. The Court further explained that a municipality can be liable under § 1983 only where its policies are the moving force behind the constitutional violation. Thus, only

18

where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.

There are two situations in which a court can find deliberate indifference in the failure to train police officers.  The first occurs when a city fails to react to repeated complaints of constitutional violations by its officers.  *Id.* at 390, n. 11.  The second situation occurs when a city fails to provide adequate training in light of foreseeable serious consequences that could result from lack of instruction.  In *Harris*, the Court cited lack of instruction on the use of firearms or in the use of deadly force as examples of what could constitute deliberate indifference. *Id.* at 390. Thus, when the need to train is "so obvious" that the failure to do so could properly be characterized as "deliberate indifference" to constitutional rights, liability against a municipality under § 1983 is proper.  *See Tennessee v. Garner*, 471 U.S. 1 (1985).

In *Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992), the Sixth Circuit applied the *Harris* test and further defined what a plaintiff had to prove in order to demonstrate that a training program is the moving force behind a constitutional violation.  The court held that, to prove a failure to train claim, a plaintiff must establish: (1) that the training program was inadequate for the tasks that officers must perform; (2) that the inadequacy was the result of the city's deliberate indifference; and (3) that the inadequacy was "closely related to" or "actually caused the . . . injury."  *Id.* at 1046 (*citing Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)); *see also Berry v. City of Detroit*, 25 F.3d 1342, 1346 (6th Cir. 1994).

Plaintiffs have further defined their failure to train and failure to supervise claims in their

19

Memorandum in Opposition to Defendants' Motion for Summary Judgment.  Plaintiffs
acknowledge that the City of Martins Ferry and the Martins Ferry Police Department have
provided police officers with training on the use of force and the use of a taser, however,
Plaintiffs argue that no training have been provided on recognizing if an individual with whom
they come into contact is suffering from a mental condition.  (Pls.' Memo. in Opp. at 21).
Plaintiffs' failure to supervise claim is a criticism of the Martins Ferry Police Department's
procedure for processing complaints against officers.  The Court will address each in turn.

### 1.      Failure to Train

Defendants argue even if Officer Dojack had training on recognizing individuals with a
mental condition, he still had a duty to investigate the complaints made regarding Mr. Edwards.
Further, Defendants argue that even if there was a failure to train, it was not a result of deliberate
indifference and there is not causal connection to Plaintiffs' alleged injuries.

In the case at bar, in order to hold Defendants liable, the trier of fact would have to find
that the inadequacy of training was so likely to result in the constitutional injury to mentally ill
persons that the City of Martins Ferry's policymakers could be deemed to be indifferent to the
need for training in that area.  Plaintiffs have the burden of proving the City of Martins Ferry and
the Martins Ferry Police Department's alleged policy of deliberate indifference and that the
deficiency, if any, was a proximate cause of Plaintiffs' alleged injuries.

Plaintiffs assert that no training has been provided to officers on recognizing if an
individual is suffering from a mental illness.  In support of this assertion, Plaintiffs highlight the
testimony of Chief Carpenter who confirmed that no training has been provided on the handling
of the mentally ill.  (Pls.' Memo. in Opp. at 21-22; Carpenter Depo. at 30-31).  In support of the

20

claim that this failure constitutes deliberate indifference, Plaintiffs rely on the testimony of their expert Ronald Traenkle. Mr. Traenkle's report regarding Defendants failure to train their officers provides that:

> It is unconscionable for officers assigned street duties to be totally lacking in this basic law enforcement skill. That training is necessary for officers to recognize persons suffering from mental illness. Without that tool, they cannot recognize the problem, they cannot effectively communicate with the subject nor can they take the steps necessary to properly deal with the situation.
>
> * * * *
>
> It is my opinion to an extremely high degree of professional certainty Martins Ferry Police Department's failure to provide professional training to its members in identifying and dealing with persons suffering mental disabilities is a gross violation of the generally accepted professional standard. Their commitment to training is far below a reasonable effort to educate officers in an essential and basis police skill.

(Pls.' Expert Witness Disclosure, Report of Ronald H. Traenkle, p. 13).

As a general matter, the Court notes that Mr. Traenkle's opinions regarding the deficiencies in the Martins Ferry Police officers' training are insufficient to hold Defendants liable under a failure to train claim. Notably, in *City of Canton*, the Supreme Court specifically stated that, the fact "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city" because "the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390-91. Further, Plaintiffs have not offered any caselaw, statutes, national or local law enforcement policies, or some other policy the suggest Defendants should have offered training on this specific issue.

As noted above, a plaintiff's allegations of inadequate training will not trigger § 1983 liability, unless the situation causing the injury is recurring such that the Court may impute prior

knowledge and deliberate indifference to the municipality. Here, Plaintiff have not suggested that this set of circumstances has ever arisen before, let alone occurred with frequency so as to impute liability to Defendants.

Finally, even if the Court were to find that Defendants should have provided training on dealing with mentally ill individuals, Plaintiffs have failed to produce any specific evidence demonstrating that Officer Dojack's use of the taser on Mr. Edwards was proximately caused by the alleged failure to train. *See Estate of Sowards v. City of Trenton*, 125 Fed. Appx. 31, 41 (6th Cir. 2005) (decedent's death due to his own threatening actions, not the alleged failure to train the police officers to deal with mentally ill persons).  In other words, Plaintiffs have not presented evidence establishing that Officer Dojack would not have used the taser on Mr. Edwards if he had received training on how to handle mentally ill individuals.  Therefore, the Court finds that Plaintiffs have failed to create a genuine issue of material fact regarding their failure to train claim and specifically the element of causation.

In summary, because Plaintiffs have failed to raise a question of material fact as to whether Defendants' failure to train its officers on the handling of mentally ill individuals constitutes deliberate indifference by Defendants leading to inadequacy in training that was closely related to the injuries suffered by Plaintiffs, the Court finds that Defendants are entitled to summary judgment on the failure to train claim.

### 2.      Failure to Supervise

Plaintiffs argue in support of their failure to supervise claim that "Incredibly, Chief

Carpenter does not even keep a record of the number of complaints which have been made against his officers or the identity of the officers who have been accused of excessive force." (Pls.' Memo. in Opp. at 12). However, Chief Carpenter testified that "contractually I cannot confront a police officer unless I have a written complaint and validated complaint in front of me." (Carpenter Depo. at 18-19). Upon receipt of a written complaint, Chief Carpenter turns those over to the United States Department of Justice for an investigation. (Carpenter Depo. at 11-12). Chief Carpenter stated that "it is best that an outside agency perform an objective analysis." (Carpenter Depo. at 11-12).

Defendants further discuss those contractual obligations Chief Carpenter referenced, specifying that he is bound by the collective bargaining agreement in effect between the Police Officers Union and the City of Martins Ferry which prohibits documenting officer personnel files with anonymous complaints. (Defs.' Reply at 11).

Plaintiffs rely on the following three cases in support of their failure to support claim: *Fiocca v. Rensselaer*, 783 F.2d 319 (2nd Cir. 1986), *Parish v. Luckie*, 963 F.2d 201 (8th Cir. 1992), and *Clark v. Pena*, 2000 U.S. Dist. LEXIS 6660 (W.D. Mich. April 28, 2000). In *Fiocca*, there was evidence that the police department wilfully refused to take written complaints from citizens complaining about excessive force despite a municipality procedure in place to do so. Thee is no evidence in the case at bar that Defendants wilfully refused to accept written complaints. To the contrary, Defendants followed through with their standard procedure in dealing with the complaint regarding Mr. Edwards. Further, unlike *Fiocca* where at least seven individuals said they were not permitted to file complaints, there is no evidence of any citizens who attempted to file a complaint regarding excessive force by any Martins Ferry Police

23

Officers.

In *Parish*, the Court held that the City has policies that were deliberately indifferent to its citizens when the police chief avoided, ignored and covered up complaints of physical and sexual abuse by one of the officers.  This case is clearly distinguishable from the case at bar as there is no evidence of a policy by the Chief or the Police Department to ignore and cover up any complaints against its officers.  It seems Plaintiffs would like the Court to infer that Defendants are somehow ignoring complaints by citizens simply because there have only been two written complaints filed.  This, however, is not evidence and there is not such evidence of a patter of use of excessive force by the Martins Ferry Police Department.

In *Clark*, despite a policy to investigate all complaints, the practice was that complaints were not properly investigated.  The complaint at issue was made by a person why willingly identified himself.  In the case at bar, Plaintiffs primary issue is with the failure to pursue anonymous complaints, however, there is no way of verifying those complaints.  Therefore, in light of the aforementioned cases, there is no evidence that Defendants were acting deliberately indifferent to the constitutional rights of Plaintiffs.

Plaintiffs also rely on their expert Ronald Traenkle in support of their argument that the handling of complaints constitutes deliberate indifference and further support that there was a policy and/or custom of failing to properly supervise and discipline their police officers with respect to the use of force.  However, Defendants assert and this Court agrees that if the police department were to follow the advice of Plaintiffs' expert who claims "all allegations of police misconduct should become part of an officer's permanent personnel file," any citizen, at any time, for any reason, could fill an officer's personnel file with spurious complaints.  (Defs.'

24

Reply at 15).

Finally, Plaintiffs have failed to establish the causal link between the alleged policy and the alleged constitutional violations. There has been no evidence of people who have attempted to come forward and file complaints regarding the use of excessive force and were denied. There is no policy of deliberate indifference to the constitutional rights of citizens. Even if the Court were to find that, there is no causal connection that if the police department permitted anonymous complaints such alleged violations of Plaintiffs' constitutional rights would not have occurred. Rather, after this incident, Plaintiffs and/or their representatives were permitted to come forward and file a complaint against Defendants which was investigated. The Court therefore finds that Defendants are entitled to summary judgment on Plaintiffs' failure to supervise claim.

## C. Deliberate Indifference to Serious Medical Need

Plaintiffs allege in Count II of the Complaint that "the City of Martins Ferry, the Martins Ferry Police Department and Chad Dojack did not provide Alfred J. Edwards with any medical care or treatment during the several hours that he was held at the Martins Ferry Police Department." (Compl. ¶34). Defendants moved for summary judgment on this claim asserting that there is no evidence to create a question of fact as there was no sign of injury at the scene, no claim of injury by Plaintiff, his relative why picked him up from the station, or his sons who saw him the day of the incident. One of Mr. Edwards' sons, David Edwards acknowledged during his deposition that he was unaware of any request by his father for medical assistance while in the custody of the Martins Ferry Police Department. (Edwards Depo. at 26). The only medical care Mr. Edwards sought was a regularly scheduled doctor's appointment a couple

weeks after the incident.  Plaintiffs' have not responded to Defendants' Motion for Summary Judgment on this claim, essentially abandoning this claim.  The Court does not find any evidence that Defendants acted with deliberate indifference to Mr. Edwards medical needs, therefore, Defendants are entitled to summary judgment on this claim.

**D.      State Law Claim for Loss of Consortium**

Plaintiffs allege a state law claim of loss of consortium.  Plaintiff Mary Eva Edwards asserts that as a result of Defendants' actions, she has suffered a loss of her husband's services, comfort and companionship.  Plaintiffs' loss of consortium claim is derivative in nature, presupposing the existence of an underlying viable tort claim.  The Court has previously determined that Defendants are entitled to summary judgment in all of the potential underlying claims, therefore, Defendants are entitled to summary judgment on Plaintiffs' loss of consortium claim as well.

## IV.  DISPOSITION

For all of the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment.  The Court also finds Plaintiffs' Motion to Compel **MOOT**.

The Clerk shall remove Documents 30 and 47 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**

27